**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **ERIC SPENCER,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:14-CV-32 (HL) |
| **EZ TITLE PAWN, INC.**, | |
| Defendant. | |

## ORDER

Plaintiff Eric Spencer, an African-American man, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and under 42 U.S.C. § 1981, alleging that his former employer, Defendant EZ Title Pawn, Inc., discriminated against him based on his race and his sex. Now before the Court is Defendant's Motion for Summary Judgment. (Doc. 31). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and determining that there is no genuine dispute of the material facts, the Court finds that Defendant is entitled to judgment as a matter of law and grants Defendant's motion.

## I.   EVIDENTIARY ISSUES

In the course of briefing this motion for summary judgment, both parties have raised questions relating to the propriety of the evidence submitted to the

Court.[1] Neither party has filed any formal motions to strike any of the evidence. However, because determination of the admissibility of the evidence will impact what portions of the record the Court may consider in deciding Defendant's pending motion for summary judgment, the Court finds it prudent first to address these preliminary issues.

### A.    "Rule of Completeness"

In response to Defendant's Statement of Material Facts Paragraphs 2-3, 24-25, 42, 52, 61, 65, 67-69, 74, 79-80, Plaintiff raises what he terms his "Rule of Completeness" objection. Plaintiff argues that when citing to a deposition in support of a particular statement of fact, Defendant is obliged to cite to every single section of the deposition pertinent to the factual assertion in question. Plaintiff misapprehends the substantive purpose of the rule.

Federal Rule of Civil Procedure 32(a)(6) and Federal Rule of Evidence 106 together codify the "rule of completeness." Rule 32(a)(6) provides, "If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce other parts." Fed.R.Civ.P. 32(a)(6).

---

[1] The Court observes that the majority of these issues have emerged as a result of the parties' rather unorthodox way of approaching the recitation of the material facts relevant to this case. In the future, the Court urges counsel to consult Local Rule 56 more carefully and to take heed of the requirement to provide a concise statement of material facts with appropriate citations for each assertion of fact. M.D.Ga. L.R. 56.

Rule 106 similarly permits an adverse party to require the production of any other part of a writing "that in fairness ought to be considered at the same time." Fed.R.Evid. 601. Thus, the essential purpose of the rule of completeness is to ensure that where fairness so requires, the entire transcript, or at the very least all relevant portions of a transcript, is made available.

Here, Defendant filed the full deposition transcript in question, and there is no rule of completeness violation. See S.E.C. v. Lauer, 478 Fed. App'x 550, 555 (11th Cir. 2012). Defendant properly cited to those portions of the deposition transcript Defendant believed supported its assertions of fact. M.D.Ga. L.R. 56. The burden then shifted to Plaintiff to cite to any additional material in the record Plaintiff believes refutes Defendant's position. Id.; see also Fed.R.Civ.P. 56(c). Plaintiff's objection, accordingly, lacks merit and is overruled.

## B.    Plaintiff's Objections to Defendant's Affidavits

Plaintiff next raises two objections to Defendant's submission of the affidavit of Catherine J. Hart (Doc. 31-3). First, Plaintiff purports to impeach Hart's deposition by tendering the affidavits of two individuals who contradict select portions of Hart's affidavit and deposition testimony, citing to Eleventh Circuit Pattern Jury Instruction § 1.1. Section 1.1 sets forth the standard preliminary instructions a court provides to an empaneled jury. Plaintiff does not reference any particular portion of this instruction, which spans a number of

pages. The Court can only assume that Plaintiff intends to cite to that portion of the instruction that explains how the jury may evaluate the credibility of a witness. Credibility determinations fall under the exclusive purview of a jury, and it is improper for a court ruling on a motion for summary judgment to draw any conclusions as to the veracity of a particular witness. See Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1155 (11th Cir. 2012). Plaintiff's impeachment objection is misplaced at this stage of the proceedings and is overruled.[2]

Next, Plaintiff objects to the Court's consideration of Hart's deposition and supporting exhibits to the extent those materials contain hearsay. Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." As explained in the advisory committee's notes, the objection functions much like an objection raised at trial, and the "burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed.R.Civ.P. 56(c)(2) advisory committee's note to 2010 amendment. Accordingly, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Jones

---

[2] The affidavits Plaintiff contends impeach Hart's testimony may, however, be construed to raise a question of fact, weak though it may be. The Court has taken the testimony of the affiants into consideration in that regard.

v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (internal quotation marks and citation omitted).

Upon review of the exhibits and testimony questioned by Plaintiff, the Court overrules Plaintiff's hearsay objection. The evidence produced by Defendant is not hearsay; however, to the extent that any portion of the evidence may possibly be construed to contain an element of hearsay, the Court is satisfied that Defendant will be able to reduce that evidence to an admissible form at trial.

### C.    "After-acquired" evidence

Plaintiff's next objection, which he asserts in response to Defendant's Statement of Material Facts Paragraphs 54 and 61, is that Defendant relied upon information acquired after Plaintiff's termination to support the decision to end Plaintiff's employment. Plaintiff argues that the evidence gathered by Catherine Hart, Plaintiff's immediate supervisor, in support of her recommendation to terminate Plaintiff was not relayed in its entirety to upper level management. Therefore, knowledge of this information cannot be attributed to Roy Hutcheson, Sr., the President of Defendant's corporation, who made the ultimate decision to terminate Plaintiff. Plaintiff advocates that the Court should not consider any evidence unknown to Hutcheson at the time of Plaintiff's termination based on

the argument that Hutcheson's decision to fire Plaintiff could not be founded on facts about which he had no direct knowledge.

Plaintiff's objection evolves out of Defendant's interrogatory responses as well as the affidavits of Joseph DeMarco, Defendant's Vice President of Operations, and Roy Hutcheson, Sr., Defendant's President. In his first interrogatories to Defendant, Plaintiff posed the following question: "Please explain in specific detail all the factual reasons why Eric Spencer was fired from your company." (Doc. 34-68). In response, Defendant stated, "Plaintiff was terminated from EZ Title Pawn, Inc. due to Plaintiff's failure to effectively manage the employees of the title pawn branches under his supervision." (Id.). Defendant then provided a number of examples how Plaintiff failed as a manager and referenced various different documents, namely e-mails, Defendant believed illustrated the point. (Id.). When asked during his deposition whether he ever personally viewed any of these records, DeMarco testified that he either did not recollect or had not reviewed many of the documents referenced in Defendant's response to Plaintiff's interrogatories. (DeMarco Dep., p. 26-36, 38-40, 44-48, 50; DeMarco Aff., p. 4). Hutcheson similarly attested that while he had a general understanding of all the reasons why Plaintiff's termination was being recommended, he had no reason to review every minute detail underlying the recommendation. (Hutcheson Aff., p. 3).

The after-acquired evidence rule essentially provides that while an employer may discover evidence after terminating an employee that potentially justifies an adverse employment decision, the employer cannot claim have been motivated to terminate an employee based on information the employer did not possess during the decision making process. McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 359-60 (1995). That simply is not the case here. Even though upper level management may not have reviewed the entire paper trail produced as evidence supporting the conclusion that Plaintiff was not effectively performing as a manager, primarily because DeMarco and Hutcheson relied upon the oral summary provided by Hart, it is clear that all of these records were maintained in the regular course of Defendant's business and were otherwise available for DeMarco and Hutcheson's inspection had they needed to consult the records when discussing the prospect of Plaintiff's termination. Plaintiff's objection is, therefore, overruled.

### D.    Defendant's Objection to Plaintiff's Voluminous Exhibits

Defendant objects to Plaintiff's inclusion of voluminous deposition exhibits and advocates that the Court should disregard any exhibits Plaintiff does not specifically cite to in his responsive documents. In responding to Defendant's motion for summary judgment, Plaintiff filed 61 deposition exhibits, totaling just

shy of 1000 pages,[3] many of which Defendant contends were never mentioned or tendered in the course of any deposition. Of those 61 exhibits, the Court notes that Plaintiff references portions of only 14 exhibits.

Rule 56(c)(1)(B)(3) instructs, "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(1)(B)(3). However, the court is not "required to ferret out delectable facts buried in a massive record." Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (citing Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statements of fact."); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (judges "are not like pigs, hunting for truffles buried in briefs.")). Based on this logic, the Court is not inclined to sift through documents Plaintiff did not otherwise find important enough to cite in support of his position. Defendant's objection is sustained.

## II.   FACTUAL BACKGROUND

The undisputed material facts are these:

Plaintiff Eric Spencer, an African-American man, began working as a Branch Manager in one of Defendant EZ Title Pawn, Inc.'s Valdosta branches in

---

[3] Based on the Court's calculation, the deposition exhibits cover 999 pages, to be exact. That is in addition to Plaintiff's 119 page Response to Defendant's Statement of Material Facts and another 415 pages in deposition transcripts, affidavits, and other discovery materials, to which Plaintiff cites very little.

December 2009. (Pl. Dep., p. 55-56). Several years into his employment, a number of changes occurred within Defendant's management that directly impacted Plaintiff. First, Plaintiff's Area Supervisor, Rhonda Krizan, a Caucasian female, was terminated by Defendant in February 2012. (Pl. Dep., p. 58-59; DeMarco Aff., p. 4-5). Then, in February or March of 2012, Defendant terminated Kim Deubel, a Caucasian female, who was the Regional Manager assigned to the particular district where Plaintiff worked. (DeMarco Dep., p. 13; DeMarco Aff., p. 5; Hart Aff., p. 1). Defendant terminated both of these women for failing to satisfactorily manage Defendant's business in the region, which resulted in significant revenue losses. (DeMarco Dep., p. 14; DeMarcro Aff., p. 5).

In the wake of this turmoil, Defendant restructured the region and hired a new Regional Manager. (DeMarco Dep., p. 13). Catherine Hart, a Caucasian female hired by Defendant in 2011 to serve as a Regional Manager in Alabama, was asked to assume the Regional Manger position for a newly created territory covering parts of Alabama and Georgia, including the area where Defendant worked. (DeMarco Dep., p. 12-13; DeMarco Aff., p. 1; Hart Dep., p. 11; Hart Aff., p. 1; Hutchison Aff., p. 2). As the new Regional Manager, one of Hart's immediate assignments was to hire a replacement Area Supervisor for the Valdosta area. (Hart Aff., p. 2). Given the history of the territory and her lack of

9

familiarity with the area, Hart found it prudent to spend some time acquainting herself with the employees before making any new hires. (Hart Aff., p. 3).

Plaintiff expressed interest in the Area Supervisor position and was instructed to submit a resume, which he did. (Pl. Dep., p. 59; Pl. Aff., ¶ 2; Hart Aff., p. 3). Hart interviewed seven or eight applicants for the Area Supervisor position, including Plaintiff. (Hart Aff., p. 3). Ultimately, based on Plaintiff's performance as a Branch Manager, Hart concluded that Plaintiff was qualified for the job and recommended to Joseph DeMarco, Defendant's Vice President of Operations, and Roy A. Hutcheson, Sr., Defendant's President, that Plaintiff be promoted. (DeMarco Dep., p. 21; DeMarco Aff., p. 2; Hart Aff., p. 3). Hart endorsed Plaintiff's advancement in spite of some complaints she received regarding Plaintiff's interpersonal skills. (Hart. Dep., p. 18-19, 237, 252).[4] DeMarco and Hutcheson approved Hart's recommendation and promoted Plaintiff to Area Supervisor in April 2012. (Pl. Dep., p. 58; DeMarco Dep., p. 21;

---

[4] In March 2012, prior to Plaintiff's promotion, Shannon Guy, who worked as a manager in Defendant's Valdosta 2 branch, lodged a complaint with Hart about Plaintiff. (Pl. Dep., p. 144; Hart Dep., p. 17-19). Hart discussed the complaint with Plaintiff and resolved the issue. (Pl. Aff., ¶ 9; Hart Dep., p. 19-20). Hart testified that Guy cried the day Plaintiff was promoted and said that she could not work for Plaintiff. (Id. at p. 252). Plaintiff denies that he did anything to instigate Guy's complaint, but he acknowledges the complaint and Guy's general attitude toward him. (Pl. Dep., p. 144-45). Plaintiff testified that Guy "was a manager who just didn't like me for whatever reason." (Id. at p. 144). According to Plaintiff, Guy "thought I was cocky and I guess she mistaked [sic] my confidence of being, you know, a good supervisor and an employee as cockiness." (Id. at p. 145).

DeMarco Aff., p. 2; Hutcheson Aff., p. 2). Hart admittedly told Plaintiff at some point following his promotion that "we can call corporate about anything, anytime we want to." (Hart Dep., p. 243). Plaintiff's recollection is that Hart stated, "We don't have to have a reason to get rid of you." (Pl. Dep., p. 59).

As a new Area Supervisor, Plaintiff received a copy of the Supervisor Handbook. (Pl. Dep., p. 65; Doc. 31-2). Plaintiff reviewed the handbook "for the most part" and had no questions concerning its contents. (Pl. Dep., p. 66). The Supervisor Handbook outlines eight primary but non-exclusive,[5] responsibilities of the Area Supervisor:

1) See that branch managers complete their duties as outlined on the Branch Manager's Responsibility sheet.

2) Approve investments that exceed employee's guidelines. . . .

3) Control repo and write-off by:
   a. Direct sale and loss on units through repo condition report.
   b. Review all write offs.
   c. Weekly review of collection activity.

4) See that branches are properly staffed with trained and competent employees.

5) Direct lending activities to see that growth objectives are met.

6) Complete periodic inspections to ensure integrity of funds and to insure that operation guidelines are being followed.

---

[5] The handbook contains the following caveat: "No manual or handbook can possibly cover all the duties of an Area Supervisor. Use this handbook as a reference and as a place to start." (Doc. 31-2, p. 51).

7)     Dispute Resolution

8)     Loss Prevention

(Doc. 31-2, p. 51).

A number of tools were available to Plaintiff to assist him in carrying out his supervisory responsibilities. Plaintiff received a variety of weekly reports for each of the seven branches under the umbrella of his supervision, including the Monday Report, the Wednesday Report, and the check-listing report. (Pl. Dep., p. 31-33, 36, 64, 138; Hart Aff., p. 3). Plaintiff also received an end of the month report. (Pl. Dep., p. 31, 38-39). Careful and regular review of these reports could alert a supervisor to various issues, such as positive or negative growth trends for a branch and discrepancies between the weekly deposit slips and the actual bank deposits. (Pl. Dep., p. 32; Doc. 31-2, p. 69; Hart Aff., p. 6). A supervisor may also discern from the reports any unusual transactions, for example, reversals, voids, balancing entries, or aborts. (Hart Aff., p. 7). Plaintiff understood that it was his responsibility to review the reports, to investigate the source of any unusual transactions, and to report any issues to Hart. (Pl. Dep., p. 31-33, 36-37, 39-40, 67, 138).[6]

---

[6] Plaintiff states that he spoke with Hart two or three times a week, or at least attempted to contact her. (Pl. Dep., p. 38; Pl. Aff., ¶ 8). In contrast, Hart claims that she and Plaintiff talked two to three times each day. (Hart Dep., p. 47-48).

Plaintiff's next line of defense for managing his employees and ensuring profitability and mitigation of loss was regular inspections and general presence in the branch offices. It was Plaintiff's responsibility "to be in the branches to know what was going on in the branch and to report anything that he thought would be of concern." (Hart Dep., p. 63; Hart Aff., p. 5). Even though there was no set requirement for the number of branches Plaintiff was to visit each week, Hart explained that she expected Plaintiff to be physically present in at least three of the seven branches over the course of the week. (Id.; Hart Aff., p. 5). Plaintiff testified that he visited stores based on the needs of a particular store. (Pl. Dep., p. 67-68).

Defendant did mandate that Plaintiff conduct a minimum of two complete office audits each month. (Pl. Dep., p. 68; DeMarco Dep., p 17; Hart Dep., p. 62; Hart Aff., p. 4). Defendant provided an inspection form that set forth how to conduct the inspection. (Pl. Dep., p. 76; Doc. 31-2, p. 63-68). A thorough inspection included reviewing of the branch's procedure for handling cash, inspecting all checks and deposits, ensuring the proper maintenance of account cards, checking files for titles, keys, and pictures, examining contracts and write-offs, and generally observing the day to day operation of the business. (Doc. 31-2, p. 63-65). Most importantly, as a part of the inspection process, Plaintiff was required to audit customer files. (Pl. Dep., p. 79; Hart Dep., p. 100). Plaintiff was

to review, at a minimum, 15 current contracts and 15 paid or renewed contracts. (Doc. 31-2, p. 63; Hart Dep., p. 100).

According to Plaintiff, each time he conducted an audit, he would review all new files created since his last inspection. (Pl. Dep., p. 79). However, Plaintiff admits that he was not conducting inspections as frequently as Defendant mandated. (Id. at p. 68). Plaintiff explained that his other duties made twice monthly inspections impossible. (Id.). He indicated that he had other responsibilities, including interviewing prospective employees and locating new real estate for one of the branches, so he "was stretched pretty thin doing all those things and – you know, in conjunction with what I had to do, or as far as trying to get those audits done." (Id. at p. 69).

In addition to the full audits, Defendant also expected Plaintiff to perform random spot audits of each branch's cash drawer. (Pl. Aff., ¶ 12; Hart Aff., p, 5). The purpose of the spot audit is to verify that the cash drawer matches the deposit summary. (Hart Dep., p. 70). Several of the Branch Managers reported to Hart that Plaintiff never conducted spot audits of the cash drawers. (Hart Dep., p. 70, 72, 130).[7]

---

[7] Plaintiff submitted affidavits from two of the Branch Managers who deny ever telling Hart that Plaintiff was not conducting audits. (Williams Aff.; Smith Aff.). However, Plaintiff has not attempted to refute Hart's statement regarding what the other five Branch Managers reported to her.

During Plaintiff's tenure as Area Supervisor, a number of issues arose in the territory under his supervision that ultimately led to his termination. From Defendant's perspective, Plaintiff struggled to maintain employee morale. (Hart Dep., p. 65). Right after Plaintiff's promotion, morale increased, but then the work environment began to deteriorate again, and Hart "was told by different employees in different branches different stories about [Plaintiff]." (Id.). Hart received numerous complaints from both employees and customers about Plaintiff's demeanor. (Hart Dep., p. 54-61, 84, 247-48; Hart Aff., p. 13-16). One complaint Hart received was that Plaintiff shouted profanity at an employee in the Moultrie branch. (Hart Dep., p. 56-57; Hart Aff., p. 13-14). The employee called Plaintiff, who at the time was at another branch, for assistance dealing with an unusual transaction. (Hart Dep., p. 56). The customer overheard Plaintiff yelling at the employee. (Id.). Both the employee and the customer called Hart to report the incident. (Id. at 57). Hart discussed the issue with Spencer, who denied any impropriety. (Id. at 59; Pl. Dep., p. 150-52; Doc. 31-2, p. 122). However, Hart gave credence to the employee's description of events, first because Hart perceived that the employee had nothing to gain by lying about the accusations, and secondly because the customer corroborated what the employee said, telling Hart that "he was embarrassed for [the employee]. That her supervisor would talk to her using those words." (Id. at 58-59). Plaintiff had an ongoing conflict with the

15

employee who was the subject of this complaint. (See Hart Aff., Ex. 2). At one point, Plaintiff went so far as to communicate with this employee only through a third party. (Hart Aff., p. 16-17; Ex. 4). In Plaintiff's opinion, the employee "had a problem with wanting to work" and was a liar. (Pl. Dep., p. 142, 153-54; Doc. 31-2, p. 123).

On another occasion, Plaintiff allegedly engaged in a shouting match with a customer in the Douglas branch. (Hart Dep., p. 54, 231-32; Hart Aff., p. 54). The disagreement arose when Plaintiff realized the customer's vehicle had been over-pawned and explained to the customer that he could receive no more money for that car. (Pl. Dep., p. 148-49; Doc. 31-2, p. 123). Hart was not present for the incident. (Hart Dep., p. 55). However, other employees relayed to her that "it was just a big deal and our employees were alarmed at the way – they – it just turned into – instead of trying to calm the situation, diffuse the situation, it just got completely out of hand." (Id. at p. 54). The customer called Hart "and said [Plaintiff] was using profanity and he was screaming." (Id.). Based on past complaints, Hart believed the customer's accusations. (Id. at 55-56).

After a third negative encounter with a customer,[8] Hart issued Plaintiff an Employee Counseling Statement on October 31, 2012. (Hart Aff., Ex. 3). In the

---

[8] During her deposition, Hart could not recollect the specifics of this particular episode. (Hart Dep., p. 60). Plaintiff, however, testified that the incident involved a belligerent customer who was arguing with the Branch Manager. (Pl. Dep., p.

report, Hart commends Plaintiff for progress made in the area but notes recent

complaints from customers and employees:

> He inherited an Area that was plagued with problems from the
> previous Supervisor. [Plaintiff] has done a phenomenal job turning
> the Area around and getting the stores and their employees headed
> back in the right direction. Recently, [Plaintiff] has had complaints
> from customers and employees. Upon investigating these
> complaints it has been determined that the problem lies with
> [Plaintiff's] people skills.

(Id.). Plaintiff denied the complaints made against him, explaining that it was all a

"huge misunderstanding." (Id.; Pl. Dep., 146-47; Hart Dep., p. 230).

Plaintiff also demonstrated an overall lack of attention to detail and failure

to follow up on what should have been obvious red flags of fraud and deception

occurring in his branches. It was standard practice for Defendant's Loss

Prevention office to contact an Area Supervisor about any accounting

discrepancies, including overages or shortages in cash or deposit

inconsistencies, no matter the amount. (Hart Aff., p. 10). Plaintiff received

numerous e-mails from Loss Prevention notifying him about balancing and

deposit issues. (See Doc. 31-2, p. 126-28, 140, 143-44, 147). Hart frequently

was copied on these e-mails, which prompted her to follow up with Plaintiff. (Hart

Aff., p. 10). Hart discussed these issues with Plaintiff as they arose. (Id. at p. 10,

53). According to Hart, "When [Plaintiff] had suspicions of something that was

---

125; Doc. 31-2, p. 120). Plaintiff stated that he was able to diffuse the situation.
(Id.).

going on, he was reassuring me that everything was fine. But he was not going into those branches and actually verifying that everything was in place." (Hart Dep., p. 106). Although Plaintiff may have called the branch to ask the branch manager for an explanation for a discrepancy or sent a general e-mail to the branch employees reminding them of their obligation to properly document and enter account information, it soon became apparent to Hart that Plaintiff "did nothing to try to find out what was going on except take the employee's word for it." (Id. at p. 125; Doc. 31-2, p. 136, 138, 143). Plaintiff admits that he did not always investigate thoroughly: "I tried to get over there, if I could. If I didn't have anything else going on, I definitely tried to get over there, but then I would have things faxed to me and I would ask questions myself." (Pl. Dep., p. 177).

In November 2012, Defendant discovered large scale fraud in the Albany branch. (Hart Aff., p. 18). A few months prior, in September 2012, Plaintiff recommended that Defendant hire Shannon Swanigan as the Branch Manager in Defendant's Albany branch. (Pl. Dep., p. 98; Hart Aff. 19). Shortly after Swanigan's hire, the Albany branch began experiencing rapid growth. (Pl. Dep., p. 100; Hart Aff., p. 19). The sudden growth in this branch raised a red flag for Hart. (Hart Dep., p. 83). "Anytime that [Defendant] see[s] a high volume of growth, it is the supervisor's duty to go into the branch to assure that it is good growth; and that all the files are in order; that we have all the collateral for the

growth; that the applications are completed correctly; that the keys are there. Everything is in place." (Id. at p. 50). Concerned, Hart contacted Plaintiff to ensure that all was well. (Id. at p. 83). Plaintiff reassured Hart that the growth was good and the result of Swanigan bringing business over from a competing company where she previously worked. (Id.). At the time, Hart "believed that [Plaintiff] knew what he was doing. He had convinced me he had experience and that he knew our manager in that area – in that branch. He knew her from interviewing her and he also knew of her from a previous employer. . . . And I really had no reason to doubt it." (Id. at p. 51).

On October 18, 2012, Plaintiff conducted an office inspection of the Albany branch. (Doc. 31-2, p. 97-99). Plaintiff observed after reviewing 45 files that numerous documents were missing from the files, including proof of residence, proof of income, keys, pictures, signatures for redemptions, and loss payees. (Id. at p. 99). Otherwise, Plaintiff noted nothing remarkable or of concern and stated that the manager would make the necessary corrections. (Id.).

Plaintiff returned to Albany on November 20, 2012 to conduct another inspection.[9] It was at that time that Plaintiff first became suspicious of a problem. (Pl. Dep., p. 104). Plaintiff discovered titles missing from several different files.

_____

[9] It is unclear from the record why Plaintiff returned to the Albany branch to conduct an inspection so soon after the previous audit. According to Hart, she instructed Plaintiff to perform the second inspection. (Hart Aff., p. 20).

(Id.). Plaintiff alerted Hart to the title issue, telling her that there appeared to be loans she approved without a title. (Id. at 107-08). Hart informed Plaintiff that she would be coming to the Albany branch. (Id. at 108). In the meantime, Plaintiff asked Swanigan, the Branch Manager, about the missing titles. Swanigan told Plaintiff that the titles had been sent to the tag office and apologized for not having copies in the file. (Doc. 31-2, p. 105; Hart Dep., p. 109).

Kenneth Christopher, Branch Manager of the Moultrie branch contacted Hart on November 27, 2012 to let her know that in the course of buying out a pawn from a competitor in Albany, he learned about a theft ring involving multiple title pawn businesses. (Hart Dep., p. 109, 111; Hart Aff., p. 20). Hart immediately called Plaintiff. (Hart Dep., p. 109). Between November 20th and November 27th when Hart called him, Plaintiff did not return to the Albany store. (Id. at 110).

Hart arrived in Albany on November 28, 2012. (Hart Dep., p. 111). Together, Hart and Plaintiff spoke with competitors, learning more about the theft ring that involved Swanigan. (Id.). Apparently, Swanigan was altering titles and then faxing the forged versions to Hart for loan approvals. (Id. at 102-03; Hart Aff., p. 21).[10] Hart could not discern the alterations from the faxed copies. (Hart

---

[10] Because Hart manages a large territory, she rarely is in an actual branch when an employee asks her to approve a loan. (Hart Dep., p. 102-03). The employees, therefore, generally fax her a copy of the title along with the requested loan. (Id.; Hart Aff., p. 21). Hart relies on the Area Supervisor to monitor the files regularly and to verify that the files contain original, valid titles. (Hart Dep., 103-04).

Dep., 103; Hart Aff., p. 21-22). Hart and Plaintiff reported their discoveries to DeMarco and Hutcheson. (Id. at p. 105-06; Doc. 32-1, p. 105-06). As a result of the Albany fraud, Defendant sustained a loss in excess of $70,000. (Hart Aff., p. 18-19). Defendant terminated Swanigan. (Hart Aff., p. 22).

On the heels of the Albany episode, Defendant incurred additional loss at the Douglas branch. Sometime in the middle of December 2012, Plaintiff became suspicious that Ashton Solomon in the Douglas branch was misappropriating funds. (Pl. Dep., p. 82). An inconsistency in the deposits appeared on one of Plaintiff's Monday reports. (Id.). Plaintiff asked Solomon to provide the deposit ticket. (Id. at p. 82-83). The ticket itself was not one Plaintiff "was used to looking at." (Id. at p. 83). Plaintiff did not investigate the matter further: "I had other things that I was working on, but I kept that in my note log to check for whenever I went over to do an audit." (Id.).

Then, on Friday, December 28, 2012 around 8:00 p.m., Plaintiff received a call from Tammy Hersey, a customer service representative in Douglas. (Pl. Dep., p. 181-82; Hart Dep., p. 108). Hersey reported to Plaintiff "that she saw money bags that was ripped and she said that she heard that Ashton had planned to stage a robbery." (Pl. Dep., p. 181). Plaintiff notified Hart of his conversation with Hersey the next day. (Id.). Hersey also contacted Hart on December 29th. (Hart Aff., p. 22). Hart called Plaintiff and instructed him to

conduct an inspection of the Douglas branch immediately. (Id.). However, Plaintiff did not go to the Douglas store to investigate until January 2, 2013. (Pl. Aff., ¶ 80; Hart Dep., p. 108; Hart Aff., p. 22). When an audit finally was conducted, numerous balancing entries and missing deposits were discovered spanning a period of several weeks. (Pl. Dep., p. 83, 164; Hart Aff., p. 22-23). Defendant eventually determined that Solomon had stolen more than $6,000. (Hart Dep., p. 121 Hart Aff., p. 24).

Prior to the discovery of the loss, the Loss Prevention office alerted Plaintiff to questionable transactions and balancing difficulties in the Douglas branch. (Hart Dep., p. 121; Doc. 31-2, p. 126-28, 134, 140). In Hart's opinion, had Plaintiff been more diligent in reviewing his reports and investigating questionable transactions, much of the loss could have been prevented. (Hart Dep., p. 121; Hart Aff., p. 24). Plaintiff admits that if he had followed up on his original suspicions earlier in December, he likely would have discovered the source of the problem. (Pl. Dep., p. 86).

Shortly thereafter, Hart concluded that Plaintiff was failing to effectively manage his branches. (Hart Aff., p. 25). Hart contacted DeMarco, her immediate supervisor, to discuss the ongoing issues with Plaintiff. (Hart Dep., p. 22; Hart Aff., p. 25). Based on the complaints received from both employees and customers, the recurring issue with theft, and Plaintiff's lack of responsiveness in

addressing suspicious activities, Hart recommended Plaintiff's termination. (Hart Aff., p. 25; DeMarco Aff., p. 3-4). DeMarco, who had been apprised generally of the issues with Plaintiff's management as they occurred, reached a similar conclusion that Plaintiff was not effectively supervising his territory. (DeMarco Dep., p. 37; DeMarco Aff.,p. 4). In coming to this decision, DeMarco relied upon his conversation with Hart, who as Regional Manager possessed knowledge of the more minute details leading up to the recommendation. (DeMarco Aff., p. 4). DeMarco relayed the same information to Hutcheson, the President of the company, who made the ultimate decision to terminate Plaintiff. (DeMarco Dep., p. 15; DeMarco Aff., p. 4; Hutcheson Aff., p. 3). Defendant terminated Plaintiff on January 7, 2013, "for failure to effectively manage the employees of the title pawn branches under his supervision." (Doc. 31-2, p. 157). Plaintiff was replaced by Michael Howell, a Caucasian man. (Hart Dep., p. 258; Hart Aff., p. 27; DeMarco Aff., p. 5; Hutcheson Aff., p. 3).

On June 7, 2013, Plaintiff submitted an Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC"), indicating that he believed he was the victim of employment discrimination and that he wished to file a charge of discrimination. (Doc. 31-2, p. 5-8). Plaintiff filed his formal Charge of Discrimination on August 6, 2013, alleging that his former employer discriminated against him based on his race, African-American, and sex, male. (Doc. 31-2, p.

23

3). The EEOC issued Plaintiff a Notice of Suit Rights on December 10, 2013. (Doc. 1-1). This lawsuit followed.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the

burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## VI.   DISCUSSION

Plaintiff asserts claims for race and sex discrimination against his former employer Defendant EZ Title Pawn, Inc. Plaintiff premises his discrimination claims on two factors. First, Plaintiff alleges that Defendant impermissibly terminated him on the basis of his race as evidenced by the fact that Defendant replaced him with a Caucasian male. Second, Plaintiff contends that Defendant discriminated against him based on his sex by treating him less favorably than a similarly situated Caucasian female.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42

25

U.S.C. § 2000e-2(a)(1). A plaintiff may establish a *prima facie* case of discrimination through either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Claims of discrimination premised on circumstantial evidence, as is the present case, are evaluated under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff first must set forth "facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff is able to do so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). "If the employer satisfies its burden of articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Wilson, 376 F.3d at 1087.

To establish a *prima face* case of discriminatory discharge, Plaintiff generally must show that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class." Thompson v. Tyson Foods, Inc., 939 F. Supp. 2d 1356, 1364 (M.D. Ga. 2013)

(citing <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003)). "If the plaintiff can make this showing – which is 'not onerous' – the establishment of a prima facie case creates a presumption that the employer discriminated against the plaintiff on the basis of race." <u>Flowers v. Troup Cty. Sch. Dist.</u>, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting <u>Burdine</u>, 450 U.S. at 253-54).

### A.   Race Discrimination

Plaintiff has presented sufficient evidence to establish a *prima face* case of race discrimination. It is undisputed that Plaintiff, who is African-American, was terminated from a position for which he was otherwise qualified[11] and was replaced by a Caucasian individual. Because Plaintiff has met this threshold requirement, the burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for terminating Plaintiff.

The employer has the burden of production, not persuasion to articulate a nondiscriminatory reason for termination, a burden that has been described as "exceedingly light." <u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 769 (11th Cir. 2005). To satisfy the burden of production, the defendant "need not persuade the court that is was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises genuine issues of fact as to whether it

---

[11] Defendant explains that it ultimately terminated Plaintiff for his incompetence as a manager. However, Defendant does not substantively dispute that Plaintiff was qualified to serve in the role of Area Supervisor at the time of his promotion.

discriminated against the plaintiff." Burdine, 450 U.S. at 254-55. "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. at 257.

Defendant states that it terminated Plaintiff's employment for failure to manage the stores under his supervision effectively. In support of this position, Defendant describes a number of issues that arose between Plaintiff's promotion from Branch Manager to Area Supervisor in April 2012 and his termination in January 2013. First, Defendant points out that during the short time Plaintiff served as Area Supervisor, Defendant received numerous complaints from both employees and customers about Plaintiff's flawed management and dispute resolution techniques. Next, Defendant contends that Plaintiff neglected to investigate accounting issues brought to Plaintiff's attention by the Loss Prevention office and generally failed to thoroughly inspect and maintain the business affairs of the various branch locations under his care. Finally, even though Defendant emphasizes that it did not terminate Plaintiff for the eventual and significant loss Defendant sustained as the result of fraud perpetrated in two of Plaintiff's seven branches, Defendant argues that had Plaintiff been performing his job duties as anticipated by Defendant, the loss could have been detected earlier. The Court is satisfied that Defendant has produced evidence sufficient to

convince a reasonable jury that its decision to terminate Plaintiff was not motivated by race-based discriminatory intent. The burden now shifts back to Plaintiff to produce "significantly probative" evidence showing that these reasons are pretext for discrimination. Young v. Gen. Foods. Corp., 840 F.2d 825, 829 (11th Cir. 1998) (internal quotation omitted).

To establish that the employer's proffered reason is nothing more than a pretext for discrimination, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision. The plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotations and punctuation omitted); see also Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (explaining that the evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence"). However, a plaintiff may not simply recharacterize the employer's proffered nondiscriminatory reasons. Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason

head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

In his attempt to establish pretext, Plaintiff focuses heavily on the veracity of Hart's belief that Plaintiff was not performing as an effective manager and argues that her decision to recommend Plaintiff's termination was influenced by some intrinsic bias. Plaintiff further argues that neither DeMarco nor Hutcheson[12] had any independent recollection of Hart's factual basis for recommending Plaintiff's termination; thus, according to Plaintiff, Defendant cannot meet its burden of producing a legitimate, non-discriminatory justification for firing Plaintiff. At the heart of these arguments, however, is Plaintiff's contention that he adequately performed his duties and that upper level management took no steps to otherwise verify the information provided by Hart regarding Plaintiff's failure to perform adequately. But neither Plaintiff conclusory allegations of discrimination nor his assertion that he did not engage in misconduct is enough to raise an inference of pretext or discrimination. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991) (quoting Carter v. City of Miami, 870 F.2d 578. 585, (11th Cir. 1989) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where

---

[12] Plaintiff also argues that Defendant failed to disclose Hutcheson as an individual with knowledge of the underlying facts. (Doc. 34-1, p. 24). The Court finds this argument unsupported by the record. (See Doc. 34-72).

[an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its action.")).

First, Plaintiff argues that Defendant's proffered motive for his termination is pretext because Hart, who recommended Plaintiff's termination, did not have a good faith belief that Plaintiff was not performing his duties. Whether or not Defendant ultimately was mistaken in the quality the work performed by Plaintiff, however, is irrelevant. The "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010); see also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (the inquiry is limited to the employer's belief that the employee is guilty of the misconduct; that the employee did not actually engage in the misconduct is irrelevant). "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." Elrod, 939 F.2d at 1470. The Eleventh Circuit has repeatedly held that an employer may terminate an employee for a good or bad reason without violating federal law. See id.; see also Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair."); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer

31

may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason all, as long as its action is not for a discriminatory reason.").

Based on the information available to her, Hart believed that Plaintiff failed as a manager, and she relayed that belief DeMarco and Hutcheson. Both DeMarco, who communicated with Hart on a regular basis, and Hutcheson relied upon Hart's experience and her daily interactions with Plaintiff in making the final decision to terminate Plaintiff. Whether or not Hart accurately assessed Plaintiff's management skills and ability to evaluate and remedy what Hart thought were obvious issues occurring under Plaintiff's supervision, and whether or not Hart was mistaken in certain information passed along to her by other employees who worked under Plaintiff, does not undermine Defendant's proffered reason that it terminated Plaintiff for ineffectively managing the stores under his care. And Plaintiff has offered no evidence to otherwise call this justification into question. See Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1223 n. 4 (11th Cir. 1982) ("for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory") (emphasis in original).

Second, Plaintiff claims that Hutcheson, who made the final decision to terminate him, was unduly influenced by the bias of Hart. Plaintiff asserts this claim under the "cat's paw" theory.[13] Under this theory, "causation may be established if the plaintiff shows that the decision maker followed the biased recommendation [of the employee] without independently investigating the complaint against the employee." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Id. In order to succeed under this theory, a plaintiff must "prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331.

Defendant does not dispute that neither DeMarco, to whom Hart first addressed issues with Plaintiff's various management failures, nor Hutcheson,

---

[13] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no award." Foster v. Thomas Cty., Ga., 927 F. Supp.2d 1350, 1361 n. 5 (quoting Staub v. Proctor Hosp., __ U.S. __ , 131 S.Ct. 1186, 1190 n. 1 (2011) (internal citations omitted).

who made the final decision to terminate Plaintiff, conducted any independent investigation to determine whether Defendant should end Plaintiff's employment. (DeMarco Aff., p. 4; Hutcheson Aff., p. 2-3). Rather, both DeMarco and Hutcheson relied on the information provided by Hart as the Regional Manager in charge of supervising Area Supervisors like Plaintiff. (DeMarco Aff., p. 3-4; Hutcheson Aff., p. 2). Nevertheless, Plaintiff argument that Hutcheson served as Hart's "cat's paw" fails because Plaintiff has presented no evidence of bias on the part of Hart. Plaintiff merely points out the obvious dichotomy in his race and Hart's, he being African-American and she Caucasian. Plaintiff also asserts his generalized impression that Hart did not like him, claiming that Hart "was not welcoming to me" and that "she didn't really want to be in my presence" is not sufficient evidence of discriminatory animus. (Pl. Dep., p. 62). Plaintiff also was under the impression that Hart did not want to promote him. (Pl. Aff., ¶ 4). Yet she did. In the absence of evidence that Hart was motivated by some discriminatory animus to recommend Plaintiff's termination, the Court cannot find Defendant liable under the cat's paw theory.

Plaintiff next attempts to establish pretext based a prior discrimination claim filed against Defendant. On August 5, 2011, a gentleman by the name of Kenneth Bernard Walker, Sr. filed a lawsuit against Defendant alleging that Defendant discriminated against him on the basis of his race. Compl., <u>Kenneth</u>

Bernard Walker, Sr. v. EZ Title Pawn, Inc., No. 7:11-CV-101-HL (M.D.Ga. 2011), Doc. 1. Under Federal Rule of Evidence 404(b), evidence of other acts of discrimination by a decision-maker against other employees in the plaintiff's same protected class may be probative of the decision-maker's discriminatory intent. Smith v. Lockhead-Martin Corp., 644 F.3d 1321, 1341 (11th Cir. 2011) (finding that a jury could reasonably conclude that the employer, who fired employees of plaintiff's same protected class around the same time as the plaintiff's discharge, also discriminated against the plaintiff); see also Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008)). However, Plaintiff here can draw no connection between his own allegations of discrimination and those of Walker, who was terminated by Defendant in August 2007, two years before Plaintiff began working for Defendant, and four years before Defendant even hired Hart. Under the circumstances, Plaintiff's "me too" evidence is not relevant to the issue of pretext. See Davis v. Int'l Paper Co., 997 F. Supp.2d 1225, 1243 (M.D. Ala. Feb. 14, 2014).

In his final attempt to prove pretext, Plaintiff asserts that evidence of Defendant's discriminatory intent lies in the favorable treatment afforded Hart, who Plaintiff contends was similarly situated to him. According to Plaintiff, Hart shared accountability in reviewing reports and detecting fraud. Plaintiff further points out that Hart was responsible for signing off on many of the fraudulent

loans issued in the Albany branch. And yet, Plaintiff, who is African-American, was terminated as a result of fraud he did not commit, and Hart, who is Caucasian, was not.

Pretext may be established through comparator evidence. Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001). To draw a valid comparison, the plaintiff must demonstrate that he and the comparators "are similarly situated in all relevant aspects." Holifield, 115 F.3d at 1562. In the context of disciplinary action, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holified, 115 F.3d at 1562; see also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1281 (11th Cir. 2008) ("The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed."). Summary judgment is appropriate where the plaintiff fails to demonstrate the existence of a similarly situated employee and where there is no other evidence of discrimination. Holifield, 115 F.3d at 1562.

The Court concludes that Hart, Plaintiff's immediate supervisor, is not a proper comparator. Initially, the Court notes that Plaintiff and Hart held two different job titles and were responsible for different job responsibilities. Plaintiff, an Area Supervisor, was accountable for the day to day operations of seven of Defendant's branch locations. As the Area Supervisor, Defendant charged Plaintiff with maintaining competent staff and generally supervising and auditing contents of the office files and accounting records for each branch. He was responsible for being physically present in the branch office, monitoring account activity through regular review of daily, weekly, and monthly generated reports, and remaining aware of pertinent issues in the community. In contrast, Hart as the Regional Manager is responsible for more general functions of Defendant's business, including managing personnel decisions, monitoring payroll, preparing performance reviews, and verifying proper training. (Hart Dep., p. 11-14). Hart also oversees the Area Supervisors, ensuring that the Area Supervisors are properly managing their staff and keeping apprised of any unusual activity. (Id. at p. 12-13). Hart manages that expenses of the individual branches and approves employees for both hire and termination. (Id. at p. 14).

In addition to the obvious differences in their job descriptions, there also is no evidence that Plaintiff and Hart have been accused of the same or similar misconduct. Plaintiff claims that he was fired for fraud he did not commit. (Doc.

34-1). He further alleges that a good portion of that fraud resulted from Hart approving loan applications without a valid title. Plaintiff's argument is misplaced. It is true that the loss Defendant sustained as a result of fraud in the Albany and Douglas branches played a role in the final decision to terminate Plaintiff. However, Defendant never accused Plaintiff of committing the fraud. Rather, Defendant terminated Plaintiff for failing to effectively manage the branches. Defendant accused Plaintiff of falling short in maintaining moral among his employees, properly handling customer disputes, neglecting to thoroughly review account files, and overlooking obvious red flags of account abuses caused by employees under his supervision. There is no evidence that Hart was ever the target of any similar accusations. Accordingly, Hart is not a valid comparator.

Despite Plaintiff's efforts, he has failed to present evidence of pretext via any of the numerous methods employed. Therefore, Defendant is entitled to summary judgment as to Plaintiff's race discrimination claim.

### B.    Sex Discrimination

For the same reasons Plaintiff's race discrimination claim fails, Plaintiff's allegation that Defendant discriminated against him on the basis of his race must also fail. Plaintiff's sex discrimination claim turns on whether or not he is able to produce evidence that Defendant treated him less favorably than a similarly situated individual outside of his protected class. The only comparator offered by

Plaintiff in support of his case is his immediate supervisor, Catherine Hart. As already discussed, Hart is not a proper comparator. Even if Hart was a proper comparator for the purpose of establishing Plaintiff's *prima facie* case of sex discrimination, as thoroughly analyzed above, Plaintiff has failed to confront Defendant's proffered non-discriminatory reason for terminating Plaintiff head on and to present evidence that Defendant's reasons are either unworthy of credence or that Defendant more likely than not truly was motivated to terminate Plaintiff based on some discriminatory intent.  Summary judgment on Plaintiff's sex discrimination case is, therefore, appropriate.

### C.    Mixed-Motive

Plaintiff argues in the alternative that he has established a triable issue of mixed-motive discrimination. A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." Quigg v. Thomas Cty. Sch. Dist., __ F.3d __, 2016 WL 692177, at *3 (11th Cir. Feb. 22, 2016). In Quigg, the Eleventh Circuit for the first time announced that the McDonnell Douglas framework is not appropriate for evaluating mixed-motive claims premised on circumstantial evidence at summary judgment. Id. at *7. Instead, the Court adopted the approach set forth by the Sixth Circuit in White v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008).

Id. "That framework requires a court to ask only whether a plaintiff has offered evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." Id. (emphasis in original).

There is no question in this case that Defendant took an adverse employment action against Plaintiff by terminating him. However, Plaintiff has presented absolutely no evidence that either his race or his sex played any role in Defendant's decision making process. Plaintiff's claim relies solely on the fact that he is an African-American man, and Hart, his supervisor, is a Caucasian woman. Plaintiff also had the generalized feeling that "EZ Title didn't have no respect for me as a man and they didn't have any respect for me as a man of color." (Pl. Dep., p. 184). Plaintiff's conclusory allegations that Defendant discriminated against him based on his race and his sex are not sufficient to permit a reasonable jury to find that an illegal bias played a role in Defendant's decision to terminate him.

### D.    § 1981 Claims

Defendant is entitled to summary judgment on Plaintiff's claims raised under 42 U.S.C. § 1981. Section 1981 is a post-Civil War statute that was enacted for the exclusive purpose of protecting citizens from racial discrimination.

42 U.S.C. § 1981(a). The statute does not provide a remedy for discrimination claims based on sex. <u>Runyon v. McCrary</u>, 427 U.S. 167 (1976). Accordingly, to the extent that Plaintiff relies on § 1981 as a basis for pursing his sex discrimination claim, his reliance is misplaced. Additionally, Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998). It then follows that Plaintiff's race based claims raised under § 1981 must fail for the same reasons addressed in relation to Plaintiff's race discrimination claims brought under the auspices of Title VII.

## III.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 31) is granted, and this case is dismissed with prejudice.

**SO ORDERED**, this the 30th day of March, 2016.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks